UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL J. HILL,

Petitioner,                    04-CV-6601-CJS

-vs-                                        DECISION and ORDER
                                                    ADOPTING REPORT
CALVIN E. WEST, Superintendent,                    and
                                                    RECOMMENDATION
Respondent.

INTRODUCTION

Michael J. Hill ("Petitioner") filed a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254, challenging his March 7, 1990, conviction and sentence in Niagara

County Court, State of New York.  The Court referred the case to the Honorable Victor

E. Bianchini, United States Magistrate Judge, for a report and recommendation

pursuant to 28 U.S.C. § 636(B)(1).  On July 24, 2008, Judge Bianchini filed his Report

and Recommendation (Docket No. 39), recommending that the petition be denied on its

merits.

On July 30, 2008, Petitioner filed objections (Docket No. 40) to the Report and

Recommendation.  On August 6, 2008, Petitioner filed supplemental objections.  For

the reasons that follow, the objections are denied, the Report and Recommendation is

adopted in its entirety, and this action is dismissed.

BACKGROUND

The underlying facts of Petitioner's case were set forth in the "Background"

section of the Report and Recommendation, and are not disputed.  Accordingly, the

1

Court will only repeat those facts that are relevant to the instant Decision and Order.

On August 25, 1989, in the City of Niagara Falls, Petitioner and his cousin, Shawn

Person ("Person"), went to the Holloway Bar to confront Shawn Thompson

("Thompson").   Person was carrying a loaded shotgun belonging to Petitioner, which

Petitioner had handed to him.   Person shot Thompson with the shotgun, and Thompson

died a few days later.   Immediately after the shooting, Person and/or Petitioner hid the

shotgun.   The next day, Person and Petitioner were arrested.   As part of the police

investigation into the shooting, officers contacted Person's brother, Myron Johns

("Johns"), and asked him to talk to Person and find out the location of the weapon.

Johns spoke to Person, and then told officers the location of the shotgun.   A police

report prepared on September 14, 1989, states, in relevant part: "On 9/12/89 Myron

Johns brother of Person called and stated that his brother had told him where the gun

was and that he may be able to get it back.   Information be [sic] that Person had said

the shooting was accidental and that Myron was told where the gun was at." (Niagara

County Supplementary Report dated September 14, 1989).   Officers later recovered the

shotgun in the location described by Person.

On September 25, 1989, the Niagara County Grand Jury indicted Petitioner and

Person for Murder in the Second Degree in violation of New York Penal Law ("Penal

Law") sections 125.25(1) and 20.00, Murder in the Second Degree in violation of Penal

Law sections 125.25(3) and 20.00, Attempted Robbery in the First Degree in violation of

Penal Law sections 160.15, 110.00 and 20.00, Criminal Possession of a Weapon in the

Second Degree in violation of Penal Law sections 265.03 and 20.00, and Criminal Use

of a Firearm in the First Degree in violation of Penal Law sections 265.09 and 20.00.

2

On February 5, 1990, Person accepted a plea bargain and pled guilty to one count of Manslaughter in the First Degree, in full satisfaction of the charges against him.  Notably, during his plea allocution before the Honorable Charles J. Hannigan, County Court Judge, Person stated that he intentionally shot Thompson.  More specifically, Person stated that he and Petitioner went to the Holloway Bar to confront Thompson, because Thompson owed Petitioner payment for drugs.  Person stated that Petitioner brought along a shotgun, concealed in a jacket, which he handed to Person when they reached the location where Thompson was standing.  Person's plea continued as follows:

> THE COURT: What happens next?
>
> THE DEFENDANT: Mike [Petitioner]  hands me the shotgun, Thompson comes from around the car, he has other people with him coming around the car, I blast him.
>
> THE COURT: Where did you shoot him?
>
> THE DEFENDANT: I can't remember, somewhere in the chest.
>
> THE COURT: How many times did you shoot him?
>
> THE DEFENDANT: Once.
>
> THE COURT: Why did you shoot him?
>
> THE DEFENDANT: Why did I shoot him?  Because he was a drug dealer.
>
> THE COURT: He's a drug dealer?
>
> THE DEFENDANT: Owed money.
>
> THE COURT: Because he owed money to a drug dealer?
>
> THE DEFENDANT: What's that?
>
> THE COURT: Because he owed money to a drug dealer?

THE DEFENDANT: Yes.

THE COURT: That's why you shot him?

THE DEFENDANT: Yes.

THE COURT: And the drug dealer's your friend, right?

THE DEFENDANT: He's my cousin.

THE COURT: Why didn't you let him shoot him?  I mean, it's his drug deal, it wasn't yours, was it?

THE DEFENDANT: No.

THE COURT: Well, why didn't you say, hey, Michael, if anybody's going to shoot this guy, you shoot him?

THE DEFENDANT: Because he gave me the gun.

THE COURT: Well, I guess then you got to shoot him, somebody hands you a gun, right?

THE DEFENDANT: I guess if that's the circumstances.

(Person Plea Transcript at pp. 9-10).

On February 8, 1990, Petitioner also accepted a plea offer, and pled guilty to

Manslaughter in the First Degree, in full satisfaction of the charges against him.  Prior to

the plea,  Judge Hannigan advised Plaintiff that pursuant to the plea, he could "be

sentenced to a state prison for a minimum of eight and a third and a maximum of 25

years[,]" and Plaintiff stated that he understood the sentence range. (Hill Plea

Transcript at 3).  During the plea allocution, Petitioner initially stated that he had given

the gun to Person earlier in the day, because Person "had a problem with some kids

and he wanted to buy my gun."  Petitioner stated that he was at the Holloway Bar when

Person arrived with the gun and shot Thompson.  Petitioner claimed that he was "just

4

there" when the shooting occurred, and Judge Hannigan explained that "just being

there" was not a crime.  Judge Hannigan then explained that, during Person's plea, he

had stated that he had killed Thompson for Petitioner:

> THE COURT: He [Persons] says he killed him for you?
>
> THE DEFENDANT: He killed him for me?
>
> THE COURT: He says he killed him because the guy owed you money
> and he wasn't going to pay you and you asked him for the money and he
> said no, I'm not going to give it to you.

(Petitioner's Plea Transcript at p. 7).    Petitioner then admitted his involvement in the

crime.

In that regard, although Petitioner initially stated that Person shot Thompson

because Thompson had threatened Petitioner's life, he ultimately admitted that the

shooting had been over a drug debt owed to him:

> THE DEFENDANT: He killed him for me, this is true, but he didn't kill the
> guy because he owed me money.  He killed the kid because the kid, he
> was threatening my life.  He was telling me that if I wasn't going to work
> for him or something like that. [sic] I wasn't going to work for no black at
> all. [sic] Hit me with a car once.  I got hit by a car by them once because I
> wouldn't sell drugs for him.
>                                           ***
> THE COURT: Your cousin says he [Thompson] owed you $450.00 for you
> supplying him drugs?
>
> THE DEFENDANT: No, the kid didn't owe me the money.  He wanted me
> to sell for him, wanted to give me stuff and I wouldn't take it.  He said if I
> wouldn't take it, I wouldn't work on that block period.
>
> THE COURT: Tell me, I've been told that you want to ple[a]d guilty to
> manslaughter in the first degree.  Tell me how you committed
> manslaughter in the first degree?
>
> THE DEFENDANT: I did it.  I knew Shawn was going to do it.  Shawn told
> me he was going to put a bullet in his head and he did it and I was there.

THE COURT: You knew he was going to kill him?

THE DEFENDANT: That's right.

THE COURT: Knowing that you gave him the weapon to do it with?

THE DEFENDANT: I didn't think he was going to go through with it but he did.

THE COURT: Why did you give him the weapon if you didn't think he was going to do it?

THE DEFENDANT: Just to see if he was going to be a man of his word.

THE COURT: Because he said he was going to kill him?  Thompson? That his name, Thompson?

THE DEFENDANT: Yes, yes.

THE COURT: He said he was going to kill him?

THE DEFENDANT: Yes, he did.

*** 

THE COURT: And you say that Thompson was the drug dealer and wanted you to sell for him and your cousin telling, you, that you're the drug dealer and Thompson sold for you and owed you $450.00, the only connection between you and Thompson is dealing crack, right? [sic]

THE DEFENDANT: That's right.

THE COURT: Your cousin doesn't deal crack, is that right?

THE DEFENDANT: No, he's like my bodyguard.

THE COURT: He's your bodyguard?

THE DEFENDANT: That's right.

THE COURT: That's why you give him the gun?

THE DEFENDANT: Yes.

*** 

THE COURT: Did you tell him he was your bodyguard?

THE DEFENDANT: It was established before I got out of jail the first time,

that was established.

THE COURT: You established this with your cousin that he was your bodyguard?

THE DEFENDANT: Yes, we did.

THE COURT: Why would he be your bodyguard?  You're bigger than he is.  Why do you have him as your bodyguard?

THE DEFENDANT: Because he was ruthless, that's why.

***

THE COURT: You're bigger than he is?

THE DEFENDANT: But that doesn't – that's right.  I'm getting all the money, though.

THE COURT: What?

THE DEFENDANT: That was the reason, getting all the money now.

THE COURT: You were getting the money?

THE DEFENDANT: Anybody that owed him and didn't pay he was going to get the rest of it.

THE COURT: You were getting all the money and he was what, collecting it?

THE DEFENDANT: Yeah, he was collecting it.

THE COURT: Going to collect from Thompson?

THE DEFENDANT: Yes, he was.

THE COURT: $450.00?

THE DEFENDANT: Yes, he was.

(Plea Transcript at pp. 7-11).

Subsequent to Petitioner's plea, Niagara County Probation prepared a pre-sentence investigation report ("PSR").  The PSR discussed various statements that

7

Petitioner and Persons had made to police investigating the shooting.   The PSR states,

in relevant part:

> Niagara Falls Police officers questioned both of them [Petitioner and
> Person] and received conflicting stories from each individual.  Hill at first
> claimed that it was the victim, Sean Thompson, that pulled out the
> shotgun, claiming the gun discharged as Person and Thompson were
> struggling over it.  Later, he changed his story and said that the victim,
> Thompson, had owed him money . . . .  Hill said Person had the shotgun
> and when Thompson tried to take the gun away from Person, it went off
> and at this point he said they both ran away.
>                                         ***
> When Person was interviewed by police officers, he originally stated that
> he and Mike Hill were both on E. Falls Street and they ran into the victim,
> Thompson, Person claiming that Thompson pulled out a shotgun, a
> struggle ensued and the gun wen off at which time both he and Mike Hill
> ran away.  Later, Person changed his story . . . .  According to Person, Hill
> was talking to the victim, Thompson, in front of the Holloway Inn and Hill
> told the victim, Thompson, to drop the money at which time Hill
> supposedly passed the gun to Person.  Person says Thompson reached
> out, slapped the gun, and at that point the gun discharged accidentally,
> the bullet striking the victim, Thompson.

(PSR at p. 4).  The PSR also stated that on February 20, 1990, Probation interviewed

Petitioner, and Petitioner stated, *inter alia*, that he never had any prior dealings with

Thompson, that Persons was not his bodyguard, and that he was considering

withdrawing his plea. (PSR at p. 7).  On March 7, 1990, Petitioner was sentenced.

During the sentencing, Petitioner's attorney stated, *inter alia*, "I had an opportunity to

review the pre-sentence report extensively.  And we do not agree with what is contained

in that report." (Sentencing Transcript at p. 2).

On December 6, 2004, Petitioner filed the subject petition. The grounds for the

petition may be summarized as follows: 1) the plea was involuntary; 2) the conviction

was the result of a coerced confession; 3) the prosecution failed to disclose evidence

favorable to the defense; 4) Petitioner was not permitted to testify before the Grand

Jury; 5) conflict of interest by one of the judges who ruled on one of Petitioners state collateral attacks; and 6) ineffective assistance of counsel. (See, Report and Recommendation [#39] at pp. 3-4).  Specifically as to his claim that favorable evidence was withheld, Petitioner contends that the prosecution failed to disclose a statement by Johns, that would have shown that the shooting was accidental.  However, there is no indication that Johns witnessed the shooting.  Instead, Johns's involvement appears to have been limited to assisting police in locating the shotgun, based on information that Person related to Johns.

Judge Bianchini, in his Report and Recommendation, concluded that all of Petitioner's grounds lacked merit.  In finding that there was no *Brady* violation with regard to information concerning Johns, Judge Bianchini noted, in relevant part, that "Johns' name appears in a police investigative report that was turned over [to] the defense prior to plea." (Report and Recommendation at pp. 14-15).  Judge Bianchini also found that the allegedly-withheld information concerning Johns would not have been material in any event. (*Id*. at 16).

On July 30, 2008, Petitioner filed objections (Docket No. [#40]) to the Report and Recommendation, complaining that Judge Bianchini's analysis of the *Brady* claim was factually mistaken, insofar as it stated that the police report concerning Johns had been turned over to the defense.  In that regard, Petitioner stated that he obtained a copy of the report through a Freedom of Information Act ("FOIA") request in 1994.  He further stated that the police report "shows that Shawn Person did not willfully pull the trigger, and that we never planned to kill no one." (Objections [#40] at p. 2).  On August 6, 2008, Petitioner filed additional objections. (Docket No. [#41]), in which he essentially

reiterates the same arguments that were contained in his habeas petition.

STANDARDS OF LAW

Pursuant to Rule 72(b)(3) of the Federal Rules of Civil Procedure ("FRCP") and Title 28 U.S.C. § 636(b)(1)(C), when a magistrate judge makes a report and recommendation on a matter that is dispositive of a party's claim or defense, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." FRCP 72(b)(3).  "However, when a party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Renelique v. Doe*, No. 99Civ.10425LTSHBP, 2003 WL 23023771 at *1 (S.D.N.Y. Dec. 29, 2003) (citations omitted).  Moreover, where a party is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

DISCUSSION

Petitioner contends that Judge Bianchini incorrectly found that the *Brady* violation claim lacked merit.  The legal principles applicable to such a claim are well settled:

> To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 431, 115 S.Ct. 1555, 1564, 131 L.Ed.2d 490 (1995); *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196-97 (" Brady ") (suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). Information coming within the scope of this principle (" Brady matter") includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. *See, e.g., Giglio v. United States*, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence").

The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government. *See, e.g., Tate v. Wood*, 963 F.2d 20, 24 (2d Cir.1992). Although a guilty plea is generally considered valid so long as the plea was intelligent and voluntary, *see, e.g., Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468-69, 25 L.Ed.2d 747 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711-12, 23 L.Ed.2d 274 (1969), the validity of the plea must be reassessed if it resulted from "impermissible conduct by state agents," *Brady v. United States*, 397 U.S. at 757, 90 S.Ct. at 1473. Impermissible conduct includes *Brady* violations. *See, e.g., Miller v. Angliker*, 848 F.2d 1312, 1320-23 (2d Cir.), *cert. denied*, 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988). Thus, we have noted that where prosecutors have withheld favorable material evidence, "even a guilty plea that was 'knowing' and 'intelligent' may be vulnerable to challenge." *Id*. at 1320 (holding that *Brady* violation invalidated agreement to plead not guilty by reason of insanity); *see Tate v. Wood*, 963 F.2d at 24-25 (remanding for evidentiary hearing with respect to effect of nondisclosure on agreement to plead guilty).

*U.S. v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).  Relief is warranted only if the withheld, favorable evidence is material:

If the government has failed to disclose to the defendant evidence favorable to him, relief is warranted only if the evidence was "material." *See, e.g., United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381-82, 87 L.Ed.2d 481 (1985). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. at 433-34, 115 S.Ct. at 1565 (internal quotation marks

omitted); *see also United States v. Wallach*, 935 F.2d 445, 458 (2d Cir.1991).

***

In the context of an attack on the validity of a plea, evidence is considered material where "there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Tate v. Wood*, 963 F.2d at 24; *see Miller v. Angliker*, 848 F.2d at 1322. Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is "the likely persuasiveness of the withheld information." *Id*. *See also United States v. Payne*, 63 F.3d at 1209 (materiality is a mixed question of fact and law, and the reviewing court, while giving substantial deference to the district court's findings of historical fact, bases its determination of materiality on an independent examination of the record).

*U.S. v. Avellino*, 136 F.3d at 256.

In the instant case, Petitioner has not demonstrated that the prosecution failed to turn over a report concerning Johns to the defense.  Instead, he apparently assumes that was the case, based on the fact that he obtained a copy of the same report through a later FOIA request.  However, even assuming that such report was not provided to the defense prior to Petitioner's plea, the report was not material.  On this point, Petitioner maintains that Johns stated that the shooting was accidental.  Such statement, though, was based on a hearsay accounts made to him by Person.  Johns did not witness the shooting.  Moreover, although Person and Petitioner both initially claimed that the shooting was accidental, both subsequently admitted, during their guilty pleas, that the shooting was intentional.  Additionally, Petitioner knew prior to sentencing that Person had previously claimed that the shooting was accidental, and he knew that he could seek to withdraw his plea.  However, he did not do so.  Accordingly, the Court agrees that the *Brady* claim lacks merit.

Petitioner also reiterates the claim, contained in his petition, that Judge Hannigan

12

misled him into pleading guilty, by falsely stating that Person, during his plea, had indicated that he killed Thompson for Petitioner.  The Court disagrees.  Judge Hannigan's comments accurately reflected Person's plea.  The Court further finds no merit to Petitioner's argument that Judge Hannigan should nevertheless have disbelieved Person's plea allocution, since he had access to Person's earlier statement to police, in which Person indicated that the shooting was accidental. (Objection [#41] at p. 2).

Petitioner also alleges that his trial counsel misled him into believing that he could receive a sentence of three-to-nine years.  In that regard, Petitioner states, "The judge stated I can get 8⅓ to 25, not that I "would" get it." (Objections [#41] at p. 4). However, that argument is demonstrably false, since Judge Hannigan clearly informed Petitioner that the minimum sentence was "eight and a third" years, and Petitioner indicated that he understood. (Plea Transcript at p. 3).

As discussed earlier, Petitioner's remaining objections are merely the same arguments that he raised before Judge Bianchini.  As to these, the Court has reviewed the Report and Recommendation and finds no clear error.  Accordingly, the objections are denied.

ORDER

It is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1)(C), the Court accepts and adopts the Report and Recommendation (Docket No. 39) in its entirety, and, for the reasons stated in the Report and Recommendation, this action is dismissed. Petitioner's Objections (Docket Nos. 40 & 41) are denied.

13

Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right.

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

Dated:   February 18, 2009
         Rochester, New York

ENTER:


 */s/ Charles J. Siragusa*
Charles J. Siragusa
United States District Judge